# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**RARE BREED TRIGGERS, LLC, a**
**Florida Limited Liability Company, and**
**KEVIN C. MAXWELL, an individual,**

      **Plaintiffs,**                                            **CASE NO.:**

**v.**

**MERRICK GARLAND, in his official**
**capacity as Attorney General of the United**
**States; U.S. DEPARTMENT OF JUSTICE;**
**BUREAU OF ALCOHOL, TOBACCO,**
**FIREARMS AND EXPLOSIVES; CRAIG**
**SAIER, in his capacity as Special Agent in**
**Charge of the Tampa Field Division, Bureau**
**of Alcohol, Tobacco, Firearms, and Explosives;**
**and MARVIN RICHARDSON, in his official**
**capacity as Acting Director, Bureau of**
**Alcohol, Tobacco, Firearms, and Explosives,**

      **Defendants.**

_____/

## PLAINTIFF'S EMERGENCY MOTION FOR A EX PARTE TEMPORARY RESTRAINING ORDER AND SUPPORTING MEMORANDUM OF LAW

The Plaintiffs, RARE BREED TRIGGERS, LLC, a Florida Limited Liability

Company ("RBT"), and KEVIN C. MAXWELL, an individual ("MAXWELL")

(collectively "Plaintiffs") pursuant to 5 U.S.C. §§ 702, 704, Rule 65 of the Federal

Rules of Civil Procedure, and Local Rule 6.01, hereby move the Court for entry of

a Temporary Restraining Order enjoining the Defendants, MERRICK GARLAND, in his official capacity as Attorney General of the United States ("AG"), U.S. DEPARTMENT OF JUSTICE ("DOJ"), CRAIG SAIER, in his capacity as Special Agent in Charge of the Tampa Field Division, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("SAC"), BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ("ATF"), and MARVIN RICHARDSON, in his official capacity as Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF DIRECTOR") (collectively "Defendants") from taking the following actions: (1) referring MAXWELL to the U.S. Attorney's Office for Criminal Prosecution; (2) seizing any property of the Plaintiffs, the customers of RBT, or related to MAXWELL's legal practice; (3) ceasing the operations of RBT; or (3) levying or collecting any tax assessments against the Plaintiffs; as such actions relate to the manufacturing or transferring of the trigger known as the "FRT-15" and the "Cease and Desist Letter" issued by the Defendants to RBT on or about July 26, 2021, pending a hearing on the Plaintiffs' Motion for Preliminary Injunction, and as grounds therefore states as follows:

## Factual Background

1.  Contemporaneously with this motion, the Plaintiffs filed a Complaint ("Complaint") supported by a sworn affidavit of Maxwell seeking declaratory and injunctive relief against the Defendants preventing the enforcement of their "Cease

and Desist Letter" issued on or about July 26, 2021. A true and correct copy of MAXWELL's Affidavit attesting to the facts herein is attached as **Exhibit "A"**.

2. According to the Cease and Desist Letter, the Defendants intend to criminally prosecute MAXWELL, seize the lawful property of the Plaintiffs, and assess and collect taxes, based on the Defendants' arbitrary and capricious conclusion that the Plaintiffs FRT-15 trigger constitutes a "machinegun" under applicable federal law. A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit "F"**.

3. The issuance of the Cease and Desist Letter constitutes final agency action because the issuance of the letter signals the consummation of an ATF's decision making process and gives rise to legal rights or consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). A reviewing court may set aside a final agency action when the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706.

4. "Machineguns" are regulated by the federal government pursuant to the 1934 National Firearms Act (26 U.S.C. Chapter 53) ("NFA").

5. Further, pursuant to the Hughes Amendment to the 1986 Firearm Owners Protection Act ("the machinegun ban"), which amended the Gun Control Act of 1968 ("GCA"), Americans are generally prohibited from possessing and transferring "machineguns".

6.      Pursuant to its reassignment from the Department of the Treasury to the Department of Justice under the Homeland Security Act of 2002, 116 Stat. 2135, ATF controls the registration and regulation of machineguns pursuant to the provisions of the NFA and GCA. *See* Final Rule at 66515 n.2.

7.      26 U.S.C. § 5845(b) defines a machinegun as follows: "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically **more than one shot, without manual reloading, <u>by a single function of the trigger</u>**. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

8.      In other words, a "machinegun" is not defined under federal law by how fast it can fire – but rather by the method in which it can fire fast.

9.      Under 18 U.S.C. § 921(23) (enacted with the 1986 machinegun ban), "[t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

10.     ATF has limited authority under the Gun Control Act to promulgate: "only such rules and regulations as are necessary to carry out the provisions of this chapter...." 18 U.S.C.§ 926(a).

11.     Under the National Firearms Act, ATF has the authority to "prescribe all needful rules and regulations for the enforcement of this title...."  26 U.S.C. § 7805(a).

12.     In other words, ATF may promulgate and enforce rules under this section of the United States Code, but ATF has no authority to change the Code or the Code's definition of what constitutes a "machinegun".

13.     RBT sells a patented semiautomatic trigger known as the "FRT-15".

14.     The FRT-15 is not a "machinegun" as that term is defined by federal law.

15.     To be clear to the Court, while there are a number of ways in which a firearm can function as a "machinegun", all machineguns operate with what is commonly referred to as an "auto sear".

16.     The auto sear replaces the need to pull the trigger repeatedly for multiple shots because the auto sear mechanically releases the firearm's hammer to fall as soon as the firearm has chambered a new round.  This will continue so long as the shooter maintains the trigger in the pulled position.  This is distinguished from a semiautomatic platform which requires the trigger to be pulled (functioned) repeatedly each time a round is fired.

17.     The FRT-15 **DOES NOT** operate as an auto sear, nor does it operate with an auto sear.  Indeed, as set forth below, the FRT-15 requires a separate and

independent pull/function for each round fired. Thus, by definition, the FRT-15 does not make a semiautomatic rifle into a "machinegun". Rather, the only thing the FRT-15 does is enable a shooter to accomplish a faster follow-up shot because of the speed at which the trigger resets.

18.    The drawing, diagrams, and videos showing the FRT-15's functions as a semiautomatic trigger are on file with the Plaintiffs. The FRT-15 functions like other semi-automatic firearm following an eight-step process in operation: Firing, Unlocking, Extracting, Ejecting, Cocking, Feeding, Chambering, and Locking.

19.    With the bolt locked in the chamber, a round of ammunition in the chamber, and the firearm's safety off, the cycle of operation begins when the shooter pulls the trigger and fires the round. As the round passes the gas port, most of the gas from the explosion of the round is vented through the gas tube and that force begins the process of sending the bolt carrier to the rear of the firearm.

20.    When that process starts, the bolt then unlocks, and the brass of the spent round is then extracted from the chamber and ejected from the firearm. Like all AR-15 firearms, as the bolt carrier moves to the rear it cocks the hammer of the firearm.

21.    In the FRT-15's patented design, as the bolt carrier cocks the hammer, the force of the cocking hammer also forces a reset on the trigger by pushing the shooter's finger forward and making the trigger ready to function again upon a

subsequent pulling of the trigger.  This is referred to as a "**forced reset**" and it is this forced reset that makes the FRT-15 legal under the NFA because it requires the pulling of the trigger again by the shooter in order to fire another round, i.e., the trigger is *forced* to mechanically reset itself and be pulled again before it can fire an additional round.

22.     Simultaneously, as the trigger is *forced* into its reset position, a locking bar, which is part of the trigger assembly, pivots into position and mechanically locks the trigger forward.  This is what prevents the trigger from functioning again until the cycle of operation is complete.

23.     Continuing through the cycle, the buffer spring behind the bolt carrier pushes the bolt carrier forward which is what feeds a new round of ammunition into the chamber from the magazine. That new round of ammunition is forced into the chamber as the bolt closes and locks into place. It is only after the bolt locks into place inside the chamber and the locking bar is disengaged that the trigger can function again to fire1 another round of ammunition upon the shooter's subsequent pull.  And until the trigger is pulled again, the firearm will not and cannot fire. In fact, pulling the trigger to the rear with enough force to overcome the forced reset function will cause the firearm to cease operation.

24. Because the FRT-15 requires a pull or function for each discharge of the firearm it is <u>not</u> a "machinegun". The Plaintiffs, however, did not simply come to this determination on their own.

25. Before the FRT-15 ever went to manufacturing, the Plaintiffs submitted their prototype to their legal counsel, Kevin P. McCann, Esq., seeking a legal opinion letter about the FRT-15's compliance with the federal laws outlined above.

26. Mr. McCann runs a legal practice and is a former ATF Resident Agent in Charge, retiring from the ATF after 25 years.

27. On or about July 31, 2020, Mr. McCann provided a legal opinion letter on this subject ("McCann Opinion Letter"). A true and correct copy of the McCann Opinion Letter is attached hereto as **Exhibit "B"**.

28. Mr. McCann provided a full analysis of the function of the FRT-15 and analyzed its function against the definition of a "machinegun" under federal law and Mr. McCann concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law.

29. The Plaintiffs further sought a second opinion on the FRT-15 prototype from International Firearms Specialist Academy ("IFSA") in Dallas, Texas.

30. IFSA's Director, Daniel O'Kelly, is also a former ATF Senior Special Agent and the Chief Firearms Technology Instructor at the ATF National Academy, where he wrote and co-wrote the entire firearms technology course of study used to

train Agents and Investigators on among other things, what is and is not a "machinegun".

31.     On or about August 6, 2020, Mr. O'Kelly provided his detailed analysis of the FRT-15's function against the definition of a "machinegun" under federal law, and he also concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law. ("IFSA Opinion Letter").  A true and correct copy of the IFSA Opinion Letter is attached hereto as **Exhibit "C"**.

32.     After the FRT-15 went into manufacturing, the Plaintiffs sought two additional examinations and opinions from two additional national firearms experts to ensure that any development changes to aid in the manufacturing of the FRT-15 had not changed its function in any way that would cause it to fall under the definition of a "machinegun".

33.     On or about February 24, 2021, the Plaintiffs received an opinion letter from Rick Vasquez, another former ATF Special Agent and Former Acting Chief of the Firearms Technology Branch.  Mr. Vasquez served as the ATF's expert on all Gun Control Act and National Firearms Act identification and classifications for the Firearms Technology Branch of the ATF (which is the same branch who allegedly conducted the ATF's examination of the FRT-15 under the Cease and Desist Letter discussed below).

34.     Mr. Vasquez also analyzed the functions of the FRT-15 against the definition of a "machinegun" under federal law and concluded that the manufactured version of the FRT-15 <u>does not</u> meet the definition of a "machinegun" ("Vasquez Opinion Letter). A true and correct copy of the Vasquez Opinion Letter is attached hereto as **Exhibit "D"**.

35.     On or about May 4, 2021, the Plaintiffs received another opinion letter from Firearms Training and Interstate Nexus Consulting, LLC ("FTINC") in Grand Rapids, Michigan, via the company's owner, Brian Luettke.

36.     Mr. Luettke is another former ATF Special Agent, with 22 years with ATF, an instructor at the ATF's National Academy where he teaches the application of the Gun Control Act and National Firearms Act identifications and classifications. Further, in his last position with ATF, Mr. Luettke was the Chief of Advanced Firearms and Interstate Nexus Branch, a sub-branch of the Firearms and Ammunition Technology Branch. He provided the Plaintiffs with yet another opinion letter that once again analyzing the functions of the manufactured version of the FRT-15 and comparing it against the definition of a "machinegun" under federal law.

37.     Mr. Luettke also concluded that the manufactured version of the FRT-15 <u>does not</u> meet the definition of a "machinegun" ("FRINC Opinion Letter). A true and correct copy of the FRINC Opinion Letter is attached hereto as **Exhibit "E"**.

38.     These four experts, with over 100 years of combined law enforcement experience, are well known to the Defendants.  This is not only because of their former employment as ATF special agents, but also because the DOJ and ATF presented each of them as experts in the Defendants' cases and criminal prosecutions on the subject of what does and does not constitute a "machinegun" under federal law.

39.     In reliance upon the opinions of the Plaintiffs' legal counsel and the opinions of these well-qualified industry experts and former ATF agents, RBT proceeded to sell the FRT-15.

40.     On or about July 26, 2021, the DOJ, acting thorough the ATF, called the Plaintiffs in for a meeting with SAC.

41.     When that meeting took place the following day, SAC, with the attendance of his legal counsel, informed the Plaintiffs he had been directed by his chain of command at the ATF to issue the Plaintiffs a Cease and Desist Letter because the ATF had "examined" the FRT-15 and had determined it to be a "machinegun" under the definitions of the above-cited federal laws.

42.     When the Plaintiffs asked to see the alleged "examination", SAC admitted to the Plaintiffs that while he knew who would normally do such an examinations (TEC Branch), he did not have the examination and had never seen it. SAC's legal counsel also confirmed she did not have it and had not seen it.

43.   SAC then hand delivered the Cease and Desist Letter to the Plaintiffs ("Cease and Desist Letter").   A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit "F"**.

44.   The Cease and Desist Letter bases all of its directives on this alleged "examination" which has never been provided to the Plaintiffs. [See id.].

45.   The Cease and Desist Letter does not reveal the method of testing or the examination applied by the ATF's Tampa Field Division in order to reach the conclusion that the FRT-15 is a machinegun, and it provides no details as to its conclusion other than to say that the FRT-15 allows more than one round of ammunition to be expelled at a time.  [See id.].

46.   The Plaintiffs advised SAC that they disagreed with any conclusion which suggests the FRT-15 can shoot more than one round by a single function of the trigger.

47.   The Plaintiffs further informed SAC that this was not just the Plaintiffs opinion because before the first FRT-15 was manufactured, the design was reviewed in detail by Retired Special Agent Kevin McCann, Esq., and former ATF Senior Special Agent, Program Manager and Chief Firearms Technology Instructor Daniel G. O'Kelly, specifically for the FRT-15 compliance with both the NFA and the Gun Control Act, and that both had rendered the opinion that the FRT-15 is <u>not</u> a machinegun.

48.     The Plaintiffs further advised SAC that they were deeply concerned about this conclusion because the ATF's Firearms Technology Branch has previously approved a forced (positive) reset trigger similar to the FRT-15 (called the 3MR trigger) in October 2013, and to the best of the Plaintiffs' knowledge and belief, the 3MR trigger design remains approved and available for purchase on the open market. A true and correct copy of the October 31, 2013 approval letter for the 3MR trigger is attached hereto as **Exhibit "G"**.

49.     Based upon their unsupported and arbitrary conclusion about the FRT-15, the Defendants informed the Plaintiffs that RBT had to immediately cease manufacturing and transferring all FRT-15 units, and within five (5) days the Plaintiffs had to make arrangements with the ATF to develop a plan for reacquiring all the FRT-15 units that have already been sold.  [See Ex. E].

50.     The Defendants have further informed the Plaintiffs that if their demands are not met, they intend to criminally prosecute MAXWELL, seize the Plaintiffs assets, and assesses and collect taxes against the Plaintiffs.  [See id.].  Thus, the Plaintiffs seek a temporary restraining order against the Defendants.

51.     Although the Court may require security under Fed. R. Civ. P. 65(c) to pay the costs and damages of any person wrongfully enjoined, no such security should be required in this case, or alternatively, the security should be limited to no more than $2,500.00, because the Defendants will suffer no damages by being

enjoined from the enforcement of the Cease and Desist Letter until a resolution of this case upon the merits and any costs incurred by them as a result of abstaining from such enforcement will be minimal. Any such security can either be deposited into the registry of the Court or the Plaintiffs may secure a bond for the same.

## **Memorandum of Law**

### 1. *Likelihood of Success on the Merits*

Although this case does not involve so-called "bump-stocks", the ATF's interpretation of what constitutes a "machinegun" under section 5845(b) has been the subject of significant scrutiny over the past few years in relation to the "bump-stock" cases and those cases are relevant to the interpretation of the term "machinegun" that is currently before this Court.

Very similarly to the instant case, for years prior to 2018, the ATF had interpreted the definition of "machinegun" <u>not</u> to include a bump-stock. *See Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 453 (6th Cir. 2021), *vacated for rehearing enbanc*, 2021 U.S. App. LEXIS 19006; *see also Guedes v. BATFE*, 140 S. Ct. 789, 789 (U.S. 2020).[1] But in March 2018, the agency completely reversed its position. The ATF suddenly claimed that bump-stocks were in fact

---

[1] Although the *Garland* opinion has been vacated due to the Sixth Circuit's decision to hold a rehearing *en banc*, the opinion provides useful background information and parallels the Plaintiffs argument, and thus it is being used for reference purposes.

"machineguns" because (according to the ATF's new interpretation) the phrase "single function of the trigger" under the definition of "machinegun" refers to the *human process* of pulling the trigger rather than the *mechanical process* of the trigger resetting. *See Garland*, 992 F.3d 446 at 469 (emphasis added). The ATF's actions upset an entire segment of the firearms industry which had been operating legally with the manufacturing and transferring of the bump-stocks for many years, and it led to consumers who had lawfully purchased these accessories now having to forfeit their bump-stocks or face criminal prosecution.

A major issue in the bump-stock cases has been what, if any, *Chevron* deference should be granted to an agency interpretation of a *criminal* statute such as section 5845(b). In sum, *Chevron* holds that when an agency interprets a statute, a two-step inquiry governs judicial review of those agency interpretations. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 840 (1984). First, the court must decide whether a statute has an ambiguity. *See id.* If the statute is not ambiguous, then the court is to determine if the agency has or has not carried out the clear will of the Congress. *See id.* Second, if the statute is ambiguous, the court must decide whether the agency's interpretation is a "reasonable" application of the statute. *See id.* If the agency's application is reasonable, then the court will normally defer to the agency's interpretation. *See id.* But if the agency interpretation

is unreasonable or is impermissible for some reason, then the agency interpretation is invalid under the statute. *See id.*

In that regard, it should be noted that the Eleventh Circuit has indicated that the courts should defer to agency interpretation under the *Chevron* doctrine even when the statute is one involving criminal penalties. *See Walther v. Bauknecht*, 155 Fed. Appx. 463, 466 (11th Cir. 2005). But the Eleventh Circuit's decision does not appear to be supported by existing precedent. The Supreme Court of the United States ("SCOTUS") has never held that agency interpretations of criminal statutes are entitled to *Chevron* deference, and the Court has been clear to point that fact out in its prior opinions. *See United States v. Apel*, 571 U.S. 359, 369 (2014) ("we have *never* held that the Government's reading of a *criminal* statute is entitled to any deference.") (emphasis added) (citing *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment)). In fact, in a recent concurring opinion in one of the bump-stock cases, Justice Gorsuch wrote a concurring opinion addressing this exact subject. *See Guedes*, 140 S. Ct. at 789-91.

After expressing his clear frustration with the ATF's flip-flopping interpretation of what a "machinegun" is, Justice Gorsuch stated the following:

> Even when *Chevron* deference is sought, ***this Court has found it inappropriate*** where "the Executive seems of two minds" about the result it prefers. *Epic Systems Corp. v. Lewis*, 584 U. S. ___, ___, 138 S. Ct. 1612, 200 L. Ed. 2d 889, 908 (2018). Nor is it a surprise that the government can lose the benefit of Chevron in situations like these and ours. If the justification for Chevron is that "'policy choices' should be left to executive

branch officials 'directly accountable to the people,'" *Epic Systems*, 584 U. S., at ___, 138 S. Ct. 1612, 200 L. Ed. 2d 889, at 908) (quoting *Chevron*, 467 U. S., at 865, 104 S. Ct. 2778, 81 L. Ed. 2d 694), then courts must equally respect the Executive's decision not to make policy choices in the interpretation of Congress's handiwork.

**To make matters worse, the law before us carries the possibility of criminal sanctions**. And, as the government itself may have recognized in offering its disclaimer, **whatever else one thinks about *Chevron*, <u>it has no role to play when liberty is at stake</u>**. Under our Constitution, "[o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *United States v. Davis*, 588 U. S. ___, ___, 139 S. Ct. 2319, 204 L. Ed. 2d 757, 766 (2019) (quoting United States v. Hudson, 11 U.S. 32, 7 Cranch 32, 34, 3 L. Ed. 259 (1812)). **Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct**. A "reasonable" prosecutor's say-so is cold comfort in comparison. **That's why this Court has "never held that the Government's reading of a criminal statute is entitled to any deference."** *United States v. Apel*, 571 U. S. 359, 369, 134 S. Ct. 1144, 188 L. Ed. 2d 75 (2014). Instead, we have emphasized, courts bear an "obligation" to determine independently what the law allows and forbids. *Abramski v. United States*, 573 U. S. 169, 191, 134 S. Ct. 2259, 189 L. Ed. 2d 262 (2014); see also 920 F. 3d, at 39-40 (opinion of Henderson, J.); *Esquivel-Quintana v. Lynch*, 810 F. 3d 1019, 1027-1032 (CA6 2016) (Sutton, J., concurring in part and dissenting in part). That obligation went unfulfilled here.

*Id.* at 789-90.

Thus, as Justice Gorsuch pointed out: (1) the SCOTUS has specifically found that the courts should <u>not</u> defer to agency interpretation when the executive (i.e., the ATF in this case) cannot decide which interpretation of the law it wishes to follow; and (2) the SCOTUS has **<u>never</u>** found that *Chevron* deference should be given to an agency's interpretation of a statute involving **<u>criminal</u>** penalties. This interpretation appears quite sound considering the fact that an agency's flip-flopping determination of what is and is not legal on any given day would leave the average person with no

proper notice of whether their contemplated conduct is or is not criminal on any given day.  That would clearly be a major violation of due process under the Fifth and Fourteenth Amendments of the U.S. Constitution and their counterpart in the Florida Constitution.  What is more, allowing an agency to supplant its own interpretations of an ambiguous statutory term in the criminal context would wreak havoc on the traditional rule of lenity in criminal cases -- which holds that if an ambiguity exists in a criminal statute, all doubts are resolved in favor of the defendant.  *See United States v. Bass*, 404 U.S. 336, 348, 92 S. Ct. 515, 523, 30 L. Ed. 2d 488 (1971).

Applying those principals to this case, nearly eight years ago, on October 31, 2013, the ATF approved a similar trigger with a similar operation to the FRT-15 called the 3MR trigger.  [See Ex. G].  The conclusion of the ATF was substantially in line with the conclusions of each of the experts who provided opinions to the Plaintiffs (all former ATF Special Agents).  [Compare Ex. G, with Exs. C-F].

Now, after RBT has relied upon that position and expended significant resources in the FRT-15, the ATF is taking a contrary position even though the approval for the 3MR trigger is still in effect.  Thus, not only has the ATF flip-flopped its positions, but it has now placed RBT in a position where it is singled-out for this selective enforcement of the ATF's new interpretation while its competitors can sell a similar trigger on the open market.  This is exactly the situation

contemplated by the SCOTUS where the executive appears to be of two minds, and thus *Chevron* deference should <u>not</u> be afforded to the ATF's actions in this case. Further, such deference should not be accorded in any event because the ATF is interpreting a criminal statute with criminal penalties, and its Cease and Desist Letter shows that it intends to selectively prosecute the Plaintiffs.

Because *Chevron* deference does not apply, the Court must interpret section 5845(b) as it would any other statute. This means applying the canons of statutory construction and giving words their general and common meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979). And although the Sixth Circuit has recently withdrawn its issued opinion in the *Garland* case due to its decision to hold a rehearing *en banc,* the analysis provided by the Sixth Circuit is substantially similar to the Plaintiffs' analysis. Thus, the Plaintiffs will provide corresponding cites to that analysis because the Plaintiffs believe it is soundly reasoned with its interpretation of the terms "single function of the trigger". *See Garland*, 992 F.3d at 468-473.

While the dictionary definition of "function" may lend support to both the mechanical and human function interpretations of "single function of the trigger", the statutory context weighs heavily in favor of the mechanical interpretation. *See id*. (internal citations omitted). To explain, the plain language of the statute refers only to the "single function *of the trigger*" – and it says nothing about any

functioning of the "trigger *finger*" or any other body part of the person operating the firearm.   *See id.*   Thus, if "function" is understood to mean "action," as the contemporaneous dictionary definitions show that it is, then the most natural reading of § 5845(b) would *not* be "single action of the trigger *finger*", but rather the "single action *of the trigger*".   *See id.*

Stated differently, even though the operator's finger may stay relatively in the same position, a trigger (such as the FTR-15) that forcibly and mechanically resets requiring the trigger to function again in order to expel another round of ammunition is <u>not</u> a "machinegun" because there is not more than one round of ammunition expelled per a "single function *of the trigger*".   Thus, the function of the trigger "finger" is not relevant to determining the status of the FRT-15 as a "machinegun" under federal law.   *See Staples v. United States*, 511 U.S. 600, 602 n.1, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act.").

As the Sixth Circuit also pointed out, this Court should note that section 5845(b)'s statutory definition of a "machinegun" describes the *firearm*. *See id.*   It does not discuss or describe the shooter, the shooter's body parts, or the shooter's

actions in any manner. *See id*. This interpretation of the statutory language is also wholly consistent with those of the Plaintiffs' experts – all of whom are former ATF Special Agents.

In fact, the Plaintiffs' experts are the very people who teach the ATF's Agents how to identify and classify "machineguns" in the first place and they have over 100 years of combined experience.  And they are the *same* experts that the Defendants use to support their criminal cases against persons who manufacture and transfer "machineguns".  Each of them those experts have presented a detailed and thorough written examination of the FRT-15 and each has concluded that it is not a machinegun.

As a result, in order to prevail, the ATF would have to attack the credibility and qualifications of these experts to render such an opinion – the very same experts the Defendants have repeatedly used to render such opinions in order to support criminal prosecutions and convictions.  That would severely impact hundreds, if not thousands, of past and present criminal cases where the expertise of these particular experts was used to prosecute or convict persons of alleged violations of the GCA and the NFA.  That is not a plausible argument for the Defendants to make.

For these reasons, the Plaintiffs are highly likely to succeed on the merits of this case and injunctive relief is justified.

2. *The Irreparable Nature of the Threatened Injury and the Reason that Notice is Impractical.*

Both the Plaintiffs and RBT's customers will be irreparably harmed if the Defendants are permitted to take these actions because not only will RBT's customers lose the monetary value of their possessions (through forced surrender, confiscation, or destruction) and their ability to use them, but all future customers of RBT will be deprived of the ability to purchase and use the FRT-15. Such customers of RBT will then inevitably seek chargebacks against the company when that property is seized which will cause unrecoverable financial ruin to the company.

What is more, the assets of the Plaintiffs will be seized causing RBT's business to collapse and cutting off MAXWELL's income and his ability to provide for himself. This will inevitably force RBT out of business, and the Plaintiffs will also be forced to disclose confidential customer lists or risk felony prosecution.

As if this were not enough, the Defendants' actions will place MAXWELL, who is a practicing attorney, at risk of suspension of his legal license due to criminal prosecution. And because RBT and MAXWELL's legal practice share a common mailing address, any seizure of property by the Defendants (such as files or computers) creates an inherent and unacceptable risk of the wrongful disclosure of privileged and protected attorney/client communications, as well as protected

attorney work-product and other protected intellectual property such as copyrighted documents.

It is also important to note that the Defendants are well aware of these issues because MAXWELL informed them of the same during the meeting with SAC. He further informed SAC that he had the opinion letters from Mr. McCann and the other experts and had relied upon them. SAC knew exactly who Mr. McCann is and know his status as a former ATF Special Agent. As the Eleventh Circuit has stated: "The defense of good faith reliance on expert advice is designed to refute the government's proof that the defendant intended to commit the offense." *United States v. Johnson*, 730 F.2d 683, 686 (11th Cir. 1984). And a defendant is entitled to rely on instruction by such experts if the record shows that all material facts were fully disclosed, and that the defendant acted in good faith. *See id*. In this case, the record reflects that the Plaintiffs took every reasonable step they could to comply with the law in good faith and that they relied upon the opinions of well-qualified counsel and experts to ensure that the FRT-15 was legally compliant. And despite their knowledge of this, the Defendants intend to wrongfully prosecute MAXWELL for the sole purpose of placing pressure on the Plaintiffs to bow to the Defendants arbitrary wises. Such an abuse of power will result in clear irreparable harm to the Plaintiffs.

Finally, it is not practicable to provide notice to the Defendants prior to the issuance of a temporary restraining order because the Defendants clearly intend to

act in a very short time frame, and neither the Plaintiffs nor this Court will be privy to when the Defendants take action unless they are restrained.  The purpose of the temporary restraining is to preserve the status quo until this Court can render a proper ruling after considering the relevant facts and legal issue.  No status quo will be preserved if the Defendants are left in the position where they may seize the Plaintiffs and their legal property, and that of their customers, disrupt their businesses, and cause harm to MAXWELL's legal clients, without prior notice to the Plaintiffs or to this Court.

3. _There is Little Risk of Substantial Harm to the Opposing Party and Granting the TRO would Serve the Public Interest._

Harm to the opposing party and the public interest factors "merge when the Government is the opposing party."  _Nken v. Holder_, 556 U.S. 418, 435 (2009).  In this case, there is little or no risk to the public by the granting of temporary injunctive relief.  The Plaintiffs are not aware of any incidents of violence that have been committed with, or that relate to, the FRT-15.  What is more, even if the FRT-15 were allowed to be banned by the ATF, it would not substantially improve public safety because similar triggers (such as the 3MR) will still be in the hands of the general public and will be available for purchase on the open market since the ATF is taking no such action in relation to similar triggers.  Thus, the ATF's proposed action does little or nothing to advance public safety from its current state.

On the other hand, the harm caused to general public by the Defendants' actions will be substantial.  The Plaintiffs will be forced by the Defendants to disclose the names of each person who purchased a FRT-15 under threat of criminal sanction.  And those owners of the FRT-15 will be forced to surrender their property to the ATF or face criminal prosecution themselves.  Thus, the prospective harm to the public is much greater in declining to grant the injunction than it is in granting it.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant a temporary restraining order halting Defendants' from taking the following actions:  (1) referring MAXWELL to the U.S. Attorney's Office for Criminal Prosecution;  (2) seizing any property of the Plaintiffs, the customers of RBT, or related to MAXWELL's legal practice; (3) forcing RBT to cease its operations; or (4) levying or collecting any tax assessments against the Plaintiffs; as well as any other relief that this Court in its discretion deems just and proper.

Kevin C. Maxwell, Esq.
Florida Bar #0604976
733 West Colonial Drive
Orlando, FL 32804
Tel: 407-480-2179
kevincmaxwell@gmail.com
Attorney for Plaintiffs