UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**RARE BREED TRIGGERS, LLC**, a
Florida Limited Liability Company, and
**KEVIN C. MAXWELL**, an individual,

    Plaintiffs,

v.

**MERRICK GARLAND**, in his official
capacity as Attorney General of the United
States; **U.S. DEPARTMENT OF JUSTICE**;
**BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES**; **CRAIG
SAIER**, in his capacity as Special Agent in
Charge of the Tampa Field Division, Bureau
of Alcohol, Tobacco, Firearms, and Explosives;
and **MARVIN RICHARDSON**, in his official
capacity as Acting Director, Bureau of
Alcohol, Tobacco, Firearms, and Explosives,

    Defendants.

CASE NO.: 6:21-cv-01245-CEM-GJK

_____/

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

    The Plaintiffs, RARE BREED TRIGGERS, LLC, a Florida Limited Liability Company ("RBT"), and KEVIN C. MAXWELL ("MAXWELL"), an individual, (collectively "Plaintiffs"), by and through their undersigned counsel, hereby sue the Defendants, MERRICK GARLAND, in his official capacity as Attorney General of the United States ("AG"), U.S. DEPARTMENT OF JUSTICE ("DOJ"), CRAIG

SAIER, in his capacity as Special Agent in Charge of the Tampa Field Division, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("SAC"), BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ("ATF"), and MARVIN RICHARDSON, in his official capacity as Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF DIRECTOR") (collectively "Defendants")), and as grounds therefore state as follows:

### Parties, Jurisdiction and Venue

1. The Plaintiffs bring this action seeking a temporary restraining order and a preliminary injunction to preserve the status quo, followed by permanent injunctive relief restraining the Defendants from enforcing the ATF's arbitrary and capricious interpretation of the term "machinegun" under federal law, which the Defendants are using to threaten criminal prosecution and civil penalties against the Plaintiffs through a Cease and Desist Letter related to the patented semiautomatic trigger known as the "FRT-15".  Finally, Plaintiffs seek a declaratory judgment that the FRT-15 does not constitute a "machinegun" under existing federal law.

2. The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

3. This Court has authority to grant the remedy the Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

4. Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

5. RBT is a Florida limited liability company with its principal place of business located at 733 W. Colonial Dr., Orlando, Florida 32804, and who is otherwise *sui juris*.

6. MAXWELL is the owner of RBT, a United States citizen, and a resident of Seminole County, Florida, and who is otherwise *sui juris*.

7. MAXWELL is a law-abiding person and has no disqualification that would prevent him from keeping and bearing arms.

8. MAXWELL is also an attorney in good standing of Florida Bar and in the United States District Court for the Middle District of Florida.

9. AG is exercising the powers of the Attorney General of the United States, and as such has been delegated certain authority by federal law to promulgate rules and regulations to carry out the provisions of the National Firearms Act of 1934 and the Gun Control Act of 1968. See 18 U.S.C. § 926; 26 U.S.C. § 7805(a).

10. DOJ is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

11. SAC is the Special Agent in Charge of the Tampa Field Division of the ATF.

12.     ATF is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.

13.     ATF DIRECTOR is responsible for overseeing the ATF's enforcement of the laws at issue in this case.

## STATEMENT OF FACTS

14.     A sworn affidavit of MAXWELL attesting to the facts contained in the Complaint is attached hereto as **Exhibit "A"**.

15.     "Machineguns" are regulated by the federal government pursuant to the 1934 National Firearms Act (26 U.S.C. Chapter 53) ("NFA").

16.     Further, pursuant to the Hughes Amendment to the 1986 Firearm Owners Protection Act ("the machinegun ban"), which amended the Gun Control Act of 1968 ("GCA"), Americans are generally prohibited from possessing and transferring "machineguns".

17.     Pursuant to its reassignment from the Department of the Treasury to the Department of Justice under the Homeland Security Act of 2002, 116 Stat. 2135, ATF controls the registration and regulation of machineguns pursuant to the provisions of the NFA and GCA. *See* Final Rule at 66515 n.2.

18.     26 U.S.C. § 5845(b) defines a machinegun as follows: "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically **more than one shot, without manual**

**reloading, <u>by a single function of the trigger</u>**. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

19. In other words, a "machinegun" is not defined under federal law by how fast it can fire – but rather by the method in which it can fire fast.

20. Under 18 U.S.C. § 921(23) (enacted with the 1986 machinegun ban), "[t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

21. ATF has limited authority under the Gun Control Act to promulgate: "only such rules and regulations as are necessary to carry out the provisions of this chapter...." 18 U.S.C. § 926(a). See Final Rule at 66527.

22. Under the National Firearms Act, ATF has the authority to "prescribe all needful rules and regulations for the enforcement of this title...." 26 U.S.C. § 7805(a).

23. In other words, ATF may promulgate and enforce rules under this section of the United States Code, but ATF has no authority to change the Code or the Code's definition of what constitutes a "machinegun".

24. RBT sells a patented semiautomatic trigger known as the "FRT-15".

25. The FRT-15 is not a "machinegun" as that term is defined by federal law.

26. To be clear to the Court, while there are a number of ways in which a firearm can function as a "machinegun", all machineguns operate with what is commonly referred to as an "auto sear".

27. The auto sear replaces the need to pull the trigger repeatedly for multiple shots because the auto sear mechanically releases the firearm's hammer to fall as soon as the firearm has chambered a new round, this will continue so long as the shooter maintains the trigger in the pulled position.  This is distinguished from a semiautomatic platform which requires the trigger to be pulled (functioned) repeatedly each time a round is fired.

28. The FRT-15 **DOES NOT** operate as an auto sear, nor does it operate with an auto sear.

29. Indeed, as set forth below, the FRT-15 requires a separate and independent pull/function for each round fired.

30. Thus, by definition, the FRT-15 does not make a semiautomatic rifle into a "machinegun".  Rather, the only thing the FRT-15 does is enable a shooter to accomplish a faster follow-up shot because of the speed at which the trigger resets.

31. The drawing, diagrams, and videos showing the FRT-15's functions as a semiautomatic trigger are on file with the Plaintiffs.

32. The FRT-15 functions like other semi-automatic firearm following an eight-step process in operation: Firing, Unlocking, Extracting, Ejecting, Cocking, Feeding, Chambering, and Locking.

33. With the bolt locked in the chamber, a round of ammunition in the chamber, and the firearm's safety off, the cycle of operation begins when the shooter pulls the trigger and fires the round.

34. As the round passes the gas port, most of the gas from the explosion of the round is vented through the gas tube and that force begins the process of sending the bolt carrier to the rear of the firearm.

35. When that process starts, the bolt then unlocks and the brass of the spent round is then extracted from the chamber and ejected from the firearm.

36. Like all AR-15 firearms, as the bolt carrier moves to the rear it cocks the hammer of the firearm.

37. In the FRT-15's patented design, as the bolt carrier cocks the hammer, the force of the cocking hammer also forces a reset on the trigger by pushing the shooter's finger forward and making the trigger ready to function again upon a subsequent pulling of the trigger.

38. This is referred to as a "forced reset" and it is this forced reset that makes the FRT-15 legal under the NFA because it requires the pulling of the trigger

again by the shooter in order to expel another round, i.e., the trigger is *forced* to mechanically reset itself and must be pulled again before it can fire an another round.

39. Simultaneously, as the trigger is *forced* into its reset position, a locking bar, which is part of the trigger assembly, pivots into position and mechanically locks the trigger forward. This is what prevents the trigger from functioning again until the cycle of operation is complete.

40. Continuing through the cycle, the buffer spring behind the bolt carrier pushes the bolt carrier forward which is what feeds a new round of ammunition into the chamber from the magazine. That new round of ammunition is forced into the chamber as the bolt closes and locks into place.

41. It is only after the bolt locks into place inside the chamber and the locking bar is disengaged may the trigger be pulled/functioned again to fire another round of ammunition upon the shooter's subsequent pull. Until the trigger is pulled again, the firearm will not and cannot fire. In fact, pulling the trigger to the rear with enough force to overcome the forced reset function will cause the firearm to cease operation.

42. Because the FRT-15 requires a pull or function for each discharge of the firearm it is <u>not</u> a "machinegun". While the FRT-15 allows for a more rapid subsequent firing of the next round by the firearm, it <u>does not</u> allow more than one

round of ammunition to be expelled per function of the trigger, and this <u>does not</u> meet the definition of a "machinegun" under the above-cited laws.

43. The Plaintiffs, however, did not simply come to this determination on their own.

44. Before the FRT-15 ever went to manufacturing, the Plaintiffs submitted their prototype to their legal counsel, Kevin P. McCann, Esq., seeking a legal opinion letter about the FRT-15's compliance with the federal laws outlined above.

45. Mr. McCann runs a legal practice and is a former ATF Resident Agent in Charge, retiring from the ATF after 25 years.

46. On or about July 31, 2020, Mr. McCann provided a legal opinion letter on this subject ("McCann Opinion Letter").  A true and correct copy of the McCann Opinion Letter is attached hereto as **Exhibit "B"**.

47. Mr. McCann provided a full analysis of the function of the FRT-15 and analyzed its function against the definition of a "machinegun" under federal law.

48. Mr. McCann concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law.

49. The Plaintiffs further sought a second opinion on the FRT-15 prototype from International Firearms Specialist Academy ("IFSA") in Dallas, Texas.

50. IFSA's Director, Daniel O'Kelly, is also a former ATF Senior Special Agent and the Chief Firearms Technology Instructor at the ATF National Academy,

where he wrote and co-wrote the entire firearms technology course of study used to train Agents and Investigators on among other things, what is and is not a "machinegun".

51. On or about August 6, 2020, Mr. O'Kelly provided his detailed analysis of the FRT-15's function against the definition of a "machinegun" under federal law, and he also concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law. ("IFSA Opinion Letter"). A true and correct copy of the IFSA Opinion Letter is attached hereto as **Exhibit "C"**.

52. After the FRT-15 went into manufacturing, the Plaintiffs sought two additional examinations and opinions from two additional national firearms experts to ensure that any development changes to aid in the manufacturing of the FRT-15 had not changed its function in any way that would cause it to fall under the definition of a "machinegun".

53. On or about February 24, 2021, the Plaintiffs received an opinion letter from Rick Vasquez, another former ATF Special Agent and Former Acting Chief of the Firearms Technology Branch. Mr. Vasquez served as the ATF's expert on all Gun Control Act and National Firearms Act identification and classifications for the Firearms Technology Branch of the ATF (which is the same branch who allegedly conducted the ATF's examination of the FRT-15 under the Cease and Desist Letter discussed below).

54. Mr. Vasquez also analyzed the functions of the FRT-15 against the definition of a "machinegun" under federal law and concluded that the manufactured version of the FRT-15 <u>does not</u> meet the definition of a "machinegun" ("Vasquez Opinion Letter). A true and correct copy of the Vasquez Opinion Letter is attached hereto as **Exhibit "D"**.

55. On or about May 4, 2021, the Plaintiffs received another opinion letter from Firearms Training and Interstate Nexus Consulting, LLC ("FTINC") in Grand Rapids, Michigan, via the company's owner, Brian Luettke.

56. Mr. Luettke is another former ATF Special Agent, with 22 years with ATF, an instructor at the ATF's National Academy where he teaches the application of the Gun Control Act and National Firearms Act identifications and classifications. Further, in his last position with ATF, Mr. Luettke was the Chief of Advanced Firearms and Interstate Nexus Branch, a sub-branch of the Firearms and Ammunition Technology Branch. He provided the Plaintiffs with yet another opinion letter that once again analyzing the functions of the manufactured version of the FRT-15 and comparing it against the definition of a "machinegun" under federal law.

57. Mr. Luettke also concluded that the manufactured version of the FRT-15 <u>does not</u> meet the definition of a "machinegun" ("FRINC Opinion Letter). A true and correct copy of the FRINC Opinion Letter is attached hereto as **Exhibit "E"**.

58. These four experts, with over 100 years of combined law enforcement experience, are well known to the Defendants. This is not only because of their former employment as ATF special agents, but also because the DOJ and ATF presented each of them as experts in the Defendants' cases and criminal prosecutions on the subject of what does and does not constitute a "machinegun" under federal law.

59. In reliance upon the opinions of the Plaintiffs' legal counsel and the opinions of these well-qualified industry experts and former ATF agents, RBT proceeded to sell the FRT-15.

60. On or about July 26, 2021, the DOJ, acting thorough the ATF, called the Plaintiffs in for a meeting with SAC.

61. When that meeting took place the following day, SAC, with the attendance of his legal counsel, informed the Plaintiffs he had been directed by his chain of command at the ATF to issue the Plaintiffs a Cease and Desist Letter because the ATF had "examined" the FRT-15 and had determined it to be a "machinegun" under the definitions of the above-cited federal laws.

62. When the Plaintiffs asked to see the alleged "examination", SAC admitted to the Plaintiffs that while he knew who would normally do such an examination, (TEC Branch), he did not have the examination and had never seen it. SAC's legal counsel also confirmed she did not have it and had not seen it.

63. SAC then hand delivered the Cease and Desist Letter to the Plaintiffs ("Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit "F"**.

64. The Cease and Desist Letter bases all of its directives on this alleged "examination" which has never been provided to the Plaintiffs. [See id.].

65. The Cease and Desist Letter does not reveal the method of testing or the examination applied by the ATF's Tampa Field Division in order to reach the conclusion that the FRT-15 is a machinegun, and it provides no details as to its conclusion other than to say that the FRT-15 allows more than one round of ammunition to be expelled at a time. [See id.].

66. The Plaintiffs advised SAC that they disagreed with any conclusion which suggests the FRT-15 can shoot more than one round by a single function of the trigger.

67. The Plaintiffs further informed SAC that this was not just the Plaintiffs opinion because before the first FRT-15 was manufactured, the design was reviewed in detail by Retired Special Agent Kevin McCann, Esq., and former ATF Senior Special Agent, Program Manager and Chief Firearms Technology Instructor Daniel G. O'Kelly, specifically for the FRT-15 compliance with both the NFA and the Gun Control Act, and that both had rendered the opinion that the FRT-15 is <u>not</u> a machinegun.

68. The Plaintiffs further advised SAC that they were deeply concerned about this conclusion because the ATF's Firearms Technology Branch has previously approved a forced (positive) reset trigger similar to the FRT-15 (called the 3MR trigger) in October 2013, and to the best of the Plaintiffs' knowledge and belief, the 3MR trigger design remains approved and available for purchase on the open market. A true and correct copy of the October 31, 2013 approval letter for the 3MR trigger is attached hereto as **Exhibit "G"**.

69. Based upon their unsupported and arbitrary conclusion about the FRT-15, the Defendants informed the Plaintiffs that RBT had to immediately cease manufacturing and transferring all FRT-15 units, and within five (5) days the Plaintiffs had to make arrangements with the ATF to develop a plan for reacquiring all the FRT-15 units that have already been sold. [See Ex. E].

70. The Defendants have further informed the Plaintiffs that if their demands are not met, they intend to criminally prosecute the Plaintiffs, seize the Plaintiffs assets, and assess and collect taxes. [See id.].

71. The Plaintiffs and RBT's customers will be irreparably harmed if the Defendants are permitted to take these actions.

72. Not only will RBT's customers lose the monetary value of their possessions (through forced surrender, confiscation, or destruction) and their ability

to use them, but all future customers of RBT will be deprived of the ability to purchase and use the FRT-15.

73. Such customers of RBT will then inevitably seek chargebacks against RBT when such property is seized which will cause irreparable financial harm to the company.

74. Further, the assets of the Plaintiffs will be seized causing RBT's business to collapse and cutting off MAXWELL's income and his ability to provide for himself and his family.

75. In addition, the Plaintiffs will be forced to close their business and disclose their confidential customer lists or risk felony prosecution.

76. The Defendants' actions further place MAXWELL, who is a practicing attorney, at risk of suspension of his legal license due to any criminal prosecution wrongfully brought by the Defendants.

77. Finally, because RBT and MAXWELL's legal practice share a common address, any seizure of property by the Defendants, such as files or computers, creates an inherent and unacceptable risk of the wrongful disclosure of privileged and protected attorney/client communications, as well as protected attorney work-product and other protected intellectual property such as copyrighted documents.

## COUNT I -- VIOLATION OF APA 5 U.S.C. § 702(2)(A))

78. Plaintiffs reallege paragraphs 1 through 78 as though fully set forth herein.

79. The Defendants' conclusion that the FRT-15 trigger constitutes a machinegun is without authority, and contrary to the plain language of the statute.

80. Further, the Defendants' conclusion that the FRT-15 is a "machinegun" is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

81. The Plaintiffs are adversely affected because they will be irreparably harmed by Defendants' actions in the manner described in paragraphs 71-78, above.

## COUNT II -- VIOLATION OF APA 5 U.S.C. § 702(2)(C))

82. Plaintiffs reallege paragraphs 1 through 78 as though fully set forth herein.

83. The Defendants' attempt to redefine the definition of a "machinegun" to reach the FRT-15 is in excess of the agency's statutory jurisdiction and authority and is short of the agency's statutory right.

84. The Defendants' arbitrary and capricious attempt to redefine the definition of a "machinegun" to reach the FRT-15 will also prohibit the ownership, possession and use of firearm accessories that are not prohibited by the relevant statutes.

85. The Plaintiffs are adversely affected because they will be irreparably harmed by Defendants' actions in the manner set forth in paragraphs 71-78, above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant all appropriate relief, including:

   a. The issuance of a temporary restraining order halting Defendants' enforcement of the Cease and Desist Letter until such time as a preliminary injunction hearing may be held;

   b. The issuance of a preliminary injunction halting Defendants' enforcement of the Cease and Desist Letter until such time as a final hearing on the merits is held;

   c. A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202) or other applicable law, finding that the Defendants' attempted classification of the FRT-15 as a "machinegun" is unlawful and unenforceable and that the FRT-15 does not constitute a "machinegun" under current federal law;

   d. An order permanently enjoining Defendants from enforcing their Cease and Desist Letter as it pertains to the FRT-15;

e. An award of attorneys' fees and costs to Plaintiffs pursuant to Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

f. Any other relief that this Court in its discretion deems just and proper.

g. Plaintiffs have provided the SAC SAIER and his legal counsel, Amy Freyermuth, Esquire, with this pleading and the associated documents via email before the filing of this action.

*/s/Kevin C. Maxwell*
Kevin C. Maxwell, Esquire

*/s/Kevin C. Maxwell*
Kevin C. Maxwell, Esq.
Florida Bar #0604976
733 West Colonial Drive
Orlando, FL 32804
Tel: 407-480-2179
kevincmaxwell@gmail.com
Attorney for Plaintiffs