UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RARE BREED TRIGGERS,
LLC, a Florida Limited Liability
Company, and KEVIN C.
MAXWELL, an individual,

      Plaintiffs,                         CASE NO.: 6:21-cv-01245-CEM-GJK

v.

MERRICK GARLAND, in his
official capacity as Attorney
General of the United States; U.S.
DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND
EXPLOSIVES; CRAIG SAIER, in
his capacity as Special Agent in Charge
of the Tampa Field Division, Bureau of
Alcohol, Tobacco, Firearms, and
Explosives; MARVIN RICHARDSON,
in his official capacity as Acting Director,
Bureau of Alcohol, Tobacco, Firearms,
and Explosives; EARL GRIFFITH, an
individual, and DAVID SMITH, an
individual,

      Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

The Plaintiffs, RARE BREED TRIGGERS, LLC, a Florida Limited Liability Company ("RBT"), and KEVIN C. MAXWELL ("MAXWELL"), an individual, (collectively "Plaintiffs"), by and through their undersigned counsel, hereby sue the Defendants, MERRICK GARLAND, in his official capacity as Attorney General of the United States ("AG"), U.S. DEPARTMENT OF JUSTICE ("DOJ"), CRAIG SAIER, in his capacity as Special Agent in Charge of the Tampa Field Division, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("SAC"), BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ("ATF"), MARVIN RICHARDSON, in his official capacity as Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF DIRECTOR"), EARL GRIFFITH ("GRIFFITH"), an individual, and DAVID SMITH ("SMITH"), an individual, (collectively "Defendants")), and as grounds therefore state as follows:

## **Parties, Jurisdiction and Venue**

1.      The Plaintiffs bring this action seeking a preliminary injunction to preserve the status quo, followed by permanent injunctive relief restraining the Defendants from enforcing the ATF's arbitrary and capricious interpretation of the term "machinegun" under federal law, which the Defendants are using to threaten criminal prosecution and civil penalties against the Plaintiffs through a Cease and Desist Letter related to the patented semiautomatic trigger known as the "FRT-15".

Finally, Plaintiffs seek a declaratory judgment that the FRT-15 does not constitute a "machinegun" under existing federal law.

2.     The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

3.     This Court has authority to grant the remedy the Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706, or alternatively pursuant to federal common law.

4.     Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

5.     RBT is a Florida limited liability company with its current principal place of business located at 255 Primera Blvd, suite 160, Lake Mary, Florida 32746, and who is otherwise *sui juris*.

6.     MAXWELL is the owner of RBT, a United States citizen, and a resident of Seminole County, Florida, and who is otherwise *sui juris*.

7.     MAXWELL is a law-abiding person and has no disqualification that would prevent him from keeping and bearing arms.

8.     MAXWELL is also an attorney in good standing of Florida Bar and in the United States District Court for the Middle District of Florida.

9.     AG is exercising the powers of the Attorney General of the United States, and as such has been delegated certain authority by federal law to promulgate

rules and regulations to carry out the provisions of the National Firearms Act of 1934 and the Gun Control Act of 1968. See 18 U.S.C. § 926; 26 U.S.C. § 7805(a).

10.     DOJ is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

11.     SAC is the Special Agent in Charge of the Tampa Field Division of the ATF.

12.     ATF is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.

13.     ATF DIRECTOR is responsible for overseeing the ATF's enforcement of the laws at issue in this case.

14.     GRIFFITH is the Chief, Firearms and Ammunition Technology Division (FATD), Enforcement Programs and Services Directorate of the ATF since March 2015 and the Court has personal jurisdiction over him because the claims in this lawsuit arise directly out of GRIFFITH's conduct directed at the Plaintiffs in the State of Florida.

15.     SMITH is an ATF agent whose job it is to conduct the testing of firearms or parts of firearms to determine whether they meet the definitions of a "machinegun" under federal law and the Court has personal jurisdiction over him

because the claims in this lawsuit arise directly out of SMITH's conduct directed at the Plaintiffs in the State of Florida.

## STATEMENT OF FACTS

16.     A sworn affidavit of MAXWELL attesting to the facts contained in the Complaint is attached hereto as **Exhibit "A"**.

17.     "Machineguns" are regulated by the federal government pursuant to the 1934 National Firearms Act (26 U.S.C. Chapter 53) ("NFA").

18.     Further, pursuant to the Hughes Amendment to the 1986 Firearm Owners Protection Act ("the machinegun ban"), which amended the Gun Control Act of 1968 ("GCA"), Americans are generally prohibited from possessing and transferring "machineguns".

19.     Pursuant to its reassignment from the Department of the Treasury to the Department of Justice under the Homeland Security Act of 2002, 116 Stat. 2135, ATF controls the registration and regulation of machineguns pursuant to the provisions of the NFA and GCA. *See* Final Rule at 66515 n.2.

20.     26 U.S.C. § 5845(b) defines a machinegun as follows: "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically **more than one shot, without manual reloading, <u>by a single function of the trigger</u>**. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and

exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

21.     In other words, a "machinegun" is not defined under federal law by how fast it can fire – but rather by the method in which it can fire fast.

22.     Under 18 U.S.C. § 921(23) (enacted with the 1986 machinegun ban), "[t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

23.     ATF has limited authority under the Gun Control Act to promulgate: "only such rules and regulations as are necessary to carry out the provisions of this chapter...." 18 U.S.C. § 926(a). See Final Rule at 66527.

24.     Under the National Firearms Act, ATF has the authority to "prescribe all needful rules and regulations for the enforcement of this title...."  26 U.S.C. § 7805(a).

25.     In other words, ATF may promulgate and enforce rules under this section of the United States Code, but ATF has no authority to change the Code or the Code's definition of what constitutes a "machinegun".

26.     RBT sells a patented semi-automatic trigger known as the "FRT-15".

27.     The FRT-15 is not a "machinegun" as that term is defined by federal law.

28.     To be clear to the Court, while there are a number of ways in which a firearm can function as a "machinegun", all machineguns operate with what is commonly referred to as an "auto sear".

29.     The auto sear replaces the need to pull the trigger repeatedly for multiple shots because the auto sear mechanically releases the firearm's hammer to fall as soon as the firearm has chambered a new round, this will continue so long as the shooter maintains the trigger in the pulled position.  This is distinguished from a semiautomatic platform which requires the trigger to be pulled (functioned) repeatedly each time a round is fired.

30.     The FRT-15 **DOES NOT** operate as an auto sear, nor does it operate with an auto sear.

31.     Indeed, as set forth below, the FRT-15 requires a separate and independent function of the trigger for each round fired.

32.     Thus, by definition, the FRT-15 does not make a semiautomatic rifle into a "machinegun".  Rather, the only thing the FRT-15 does is enable a shooter to accomplish a faster follow-up shot because of the speed at which the trigger resets.

33.     The videos showing the FRT-15 functioning as a semi-automatic trigger are attached as **Composite Exhibit J** (thumb drive).

34.     A semi-automatic firearm equipped with an FRT-15 functions like any other semi-automatic firearms following an eight-step process in operation: Firing, Unlocking, Extracting, Ejecting, Cocking, Feeding, Chambering, and Locking.

35.     With the bolt locked in the chamber, a round of ammunition in the chamber, and the firearm's safety off, the cycle of operation begins when the shooter pulls the trigger and fires the round.

36.     As the round passes the gas port, most of the gas from the explosion of the round is vented through the gas tube and that force begins the process of sending the bolt carrier to the rear of the firearm.

37.     When that process starts, the bolt then unlocks and the brass of the spent cartridge is then extracted from the chamber and ejected from the firearm.

38.     Like all AR-15 firearms, as the bolt carrier moves to the rear, it cocks the hammer of the firearm.

39.     In the FRT-15's patented design, as the bolt carrier cocks the hammer, the force of the cocking hammer also forces a reset on the trigger by pushing the trigger forward and making the trigger ready to function again upon a subsequent function of the trigger.

40.     This is referred to as a "forced reset" and it is this forced reset that makes the FRT-15 legal under the NFA because it requires a separate function of the trigger again by the shooter in order to expel another round, i.e., the trigger is *forced*

to mechanically reset itself and must be functioned again before it can fire an additional round.

41.     Simultaneously, as the trigger is *forced* into its reset position, a locking bar, which is part of the trigger assembly, pivots into position and mechanically locks the trigger forward.  This is what prevents the trigger from functioning again, regardless of the amount of force applied to the trigger, until the cycle of operation is complete.

42.     Continuing through the cycle, the buffer spring behind the bolt carrier pushes the bolt carrier forward which is what feeds a new round of ammunition into the chamber from the magazine. That new round of ammunition is forced into the chamber as the bolt closes and locks into place.

43.     It is only after the bolt locks into place inside the chamber and the locking bar is disengaged that the trigger can function again to expel another round of ammunition upon the shooter's subsequent pull.  Until the trigger is pulled again, the firearm will not and cannot fire another round. In fact, pulling the trigger to the rear with enough force to overcome the forced reset function will cause the firearm to cease operation.

44.     Because the FRT-15 requires a separate function of the trigger for each discharge of the firearm it is <u>not</u> a "machinegun".  While the FRT-15 allows for a more rapid subsequent firing of the next round by the firearm, it <u>does not</u> allow more

than one round of ammunition to be expelled per single function of the trigger, and this <u>does not</u> meet the definition of a "machinegun" under the above-cited laws.

45.     The Plaintiffs, however, did not simply come to this determination on their own.

46.     Before the FRT-15 ever went to manufacturing, the Plaintiffs submitted their prototype to their legal counsel, Kevin P. McCann, Esq., seeking a legal opinion letter about the FRT-15's compliance with the federal laws outlined above.

47.     Mr. McCann runs a legal practice and is a former ATF Resident Agent in Charge, retiring from the ATF after 25 years.

48.     On or about July 31, 2020, Mr. McCann provided a legal opinion letter on this subject ("McCann Opinion Letter").  A true and correct copy of the McCann Opinion Letter is attached hereto as **Exhibit "B"**.

49.     Mr. McCann provided a full analysis of the function of the FRT-15 and analyzed its function against the definition of a "machinegun" under federal law.

50.     Mr. McCann concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law.

51.     The Plaintiffs further sought a second opinion on the FRT-15 prototype from International Firearms Specialist Academy ("IFSA") in Dallas, Texas.

52.     IFSA's Director, Daniel O'Kelly, is also a former ATF Senior Special Agent and the Chief Firearms Technology Instructor at the ATF National Academy,

where he wrote and co-wrote the entire firearms technology course of study used to train Agents and Investigators on among other things, what is and is not a "machinegun".

53.    On or about August 6, 2020, Mr. O'Kelly provided his detailed analysis of the FRT-15's function against the definition of a "machinegun" under federal law, and he also concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law. ("IFSA Opinion Letter").  A true and correct copy of the IFSA Opinion Letter is attached hereto as **Exhibit "C"**.

54.    After the FRT-15 went into manufacturing, the Plaintiffs sought two additional examinations and opinions from two additional national firearms experts to ensure that any development changes to aid in the manufacturing of the FRT-15 had not changed its function in any way that would cause it to fall under the definition of a "machinegun".

55.    On or about February 24, 2021, the Plaintiffs received an opinion letter from Rick Vasquez, another former ATF Special Agent and Former Acting Chief of the Firearms Technology Branch.  Mr. Vasquez served as the ATF's expert on all Gun Control Act and National Firearms Act identification and classifications for the Firearms Technology Branch of the ATF (which is the same branch who allegedly conducted the ATF's examination of the FRT-15 under the Cease and Desist Letter discussed below).

56.     Mr. Vasquez also analyzed the functions of the FRT-15 against the definition of a "machinegun" under federal law and concluded that the manufactured version of the FRT-15 <u>does not</u> meet the definition of a "machinegun" ("Vasquez Opinion Letter). A true and correct copy of the Vasquez Opinion Letter is attached hereto as **Exhibit "D"**.

57.     On or about May 4, 2021, the Plaintiffs received another opinion letter from Firearms Training and Interstate Nexus Consulting, LLC ("FTINC") in Grand Rapids, Michigan, via the company's owner, Brian Luettke.

58.     Mr. Luettke is another former ATF Special Agent, with 22 years with ATF, an instructor at the ATF's National Academy where he taught the application of the Gun Control Act and National Firearms Act identifications and classifications. Further, in his last position with ATF, Mr. Luettke was the Chief of Advanced Firearms and Interstate Nexus Branch, a sub-branch of the Firearms and Ammunition Technology Branch.

59.     Mr. Luettke provided the Plaintiffs with yet another opinion letter confirming the manufactured version of the FRT-15 does not operate as a "machinegun" as defined under 26 U.S.C. § 5845(b). ("FRINC Opinion Letter). A true and correct copy of the FRINC Opinion Letter is attached hereto as **Exhibit "E"**.

60.     These four experts, with over 100 years of combined law enforcement experience, are well known to the Defendants.  This is not only because of their former employment as ATF special agents, but also because the DOJ and ATF presented each of them as experts in the Defendants' cases and criminal prosecutions on the subject of what does and does not constitute a "machinegun" under federal law.

61.     In reliance upon the opinions of the Plaintiffs' legal counsel and the opinions of these qualified industry experts and former ATF agents, RBT proceeded to sell the FRT-15.

62.     In or around January 2021, the ATF opened an investigation into the Plaintiffs and into the FRT-15 trigger based upon online videos it viewed of persons supposedly using the FRT-15 trigger.

63.     According to the administrative record filed the evening of August 16, 2021, before the ATF had ever obtained an FRT-15 for testing or examination, ATF agents began sending e-mails between one another, as is reflected in the Defendants' filing in this matter, stating that the FRT-15 was expected to be classified as a "machinegun", but that it could not officially be done until the ATF obtained an FRT-15 and conducted a formal test.

64.    On or about June 2021, the ATF finally allegedly obtained an FRT-15 and, acting through SMITH, began conducting tests upon the alleged FRT-15 they had obtained.

65.    The tests conducted by SMITH, however, were faulty and intentionally misleading for the purpose of conforming the tests to the predetermined outcome of the ATF, i.e., that the FRT-15 was going to be a "machinegun".

66.    SMITH has attempted to prove the FRT-15 was a "machinegun" by zip-tying the trigger. [See Doc. 28]. While his report makes no mention of the use of a zip-tie, he does claim that he pulled the trigger and held it to the rear and the NFC weapon fired rounds automatically by a single pull/function of the trigger.

67.    One reason that this test is faulty and intentionally misleading is that the ATF's video of this test shows that SMITH held the back-end of the zip-tie and manipulated it during the course of the test.

68.    Another reason that this test is faulty and intentionally misleading is the addition of a zip-tie. Under 26 U.S.C. § 5845(b) when SMITH installed the zip-tie he added a part and thereby he manufactured a "machinegun".  The zip-tie acts as a spring that repeatedly causes the pulling of the trigger, i.e., SMITH is adding an additional part to the gun, that does not exist on the FRT-15 to try and make the FRT-15 meet the definition of a "machinegun". This is really no different than

SMITH adding any other part to the firearm, such as an auto sear, as described above, in order to obtain the results the ATF had predetermined.

69.   In addition, the ATF attempted to classify the FRT-15 as a "machinegun" by reliance on a patent *for a different trigger* and by comparing it to dissimilar triggers that it had previously ruled were machineguns.

70.   The ATF, acting through SMITH, intentionally failed to honestly analyze the FRT-15's separate and distinct patent. Instead, SMITH has suggested, by going so far as to misstate both fact and case law in his report, that the FRT-15 patent is the *same* as other ATF examined dissimilar triggers. This would suggest the United States Patent office issued a patent for the FRT-15 design that was already patented for another trigger – an assertion which is demonstrably false.

71.   The ATF, acting through SMITH, also intentionally failed to compare the FRT-15 with the trigger most similar to it and that is currently on the market (the 3MR trigger) -- a trigger which the ATF has previously approved.  This was intentionally omitted because SMITH and his superiors knew that if an honest comparison was made between the FRT-15 and the 3MR trigger, there would be no justifiable basis to classify one as a "machinegun" and the other as not.

72.   The ATF further arbitrarily relied upon unverified and uninvestigated video postings and comments of persons posting in internet chatrooms whose names

and credentials are unknown as a basis for determining the FRT-15 to be a "machinegun" before it ever had a trigger to examine.

73.     During the entire course of their investigation, the ATF intentionally failed to contact the Plaintiffs to conduct an interview or to offer the Plaintiffs any opportunity to rebut the claims of the ATF or to place any materials into the administrative record of this case.

74.     Based on these arbitrary, misleading and one-sided actions, the ATF made their final agency decision to issue a "Cease and Desist" letter to the Plaintiffs on July 26, 2021.

75.     That final agency decision and action was taken before the Plaintiffs were ever given notice or an opportunity to respond, and the purpose of this was to prevent the Plaintiffs from rebutting the ATF's arbitrary and highly defective investigation.

76.     On or about July 26, 2021, the DOJ, acting thorough the ATF, called the Plaintiffs in for a meeting with SAC, however, the Plaintiffs were not advised as to the substance of the meeting.

77.     When that meeting took place the following day, July 27, 2021, SAC, with the attendance of his legal counsel, informed the Plaintiffs he had been directed by his chain of command at the ATF to issue the Plaintiffs a Cease and Desist Letter

because the ATF had "examined" the FRT-15 and had determined it to be a "machinegun" under the definitions of 26 U.S.C. § 5845(b).

78.     Despite the fact that this examination and report were already complete well prior to that meeting, no copy was provided to the Plaintiffs.  And when the Plaintiffs asked to see the alleged "examination", SAC admitted to the Plaintiffs that while he knew who would normally do such an examination, he did not have the examination and had never seen it. SAC's legal counsel also confirmed she did not have it and had not seen it.  During this same June 27, 2021 meeting, SAC advised he would look into getting a copy of the report to the Plaintiffs, no report was provided. This was intentionally done for the purposes of not allowing the Plaintiffs to respond to the ATF's report.

79.     Without knowledge of what "examination" the ATF had conducted, the Plaintiffs advised SAC that they were familiar with improper tactics used during ATF testing and that they suspected that the ATF had attached a zip-tie to the FRT-15 in an effort to wrongfully classify it as a "machinegun".

80.     The Plaintiffs further advised SAC they disagreed with any conclusion which suggests the FRT-15 can shoot more than one round by a single function of the trigger.

81.     The Plaintiffs further informed SAC that this was not just the Plaintiffs opinion because before the first FRT-15 was manufactured, the design was reviewed

in detail by Retired Special Agent Kevin McCann, Esq., and former ATF Senior Special Agent, Program Manager and Chief Firearms Technology Instructor Daniel G. O'Kelly, Rick Vasquez and Brian Luettke, specifically for the FRT-15 compliance with both the NFA and the Gun Control Act, and that all had rendered the opinion that the FRT-15 is <u>not</u> a machinegun.

82.     The Plaintiffs further advised SAC that they were deeply concerned about this conclusion because the ATF's Firearms Technology Branch has previously approved a forced (positive) reset trigger similar to the FRT-15 (called the 3MR trigger) in October 2013, and to the best of the Plaintiffs' knowledge and belief, the 3MR trigger design remains approved and available for purchase on the open market.  A true and correct copy of the October 31, 2013 approval letter for the 3MR trigger is attached hereto as **Exhibit "G"**.

83.     SAC then hand delivered the Cease and Desist Letter to the Plaintiffs that had been issued the day before ("Cease and Desist Letter").   A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit "F"**.

84.     Despite repeated demands to the ATF over the next week to be given a copy of the "examination", no copy was provided to the Plaintiffs.  This was intentionally done to prevent the Plaintiffs from rebutting the report in any way or allowing those rebuttals to become part of the administrative record.

85.     Since no copy of the "examination" was forthcoming, on August 2, 2021, MAXWELL sent a letter to the SAC and his counsel outlining that he had still not been provided with a copy of the ATF report, and that he was providing copies of each of his expert's reports mentioned at the previous meeting demonstrating that the FRT-15 had been thoroughly examined and determined **not** to be a "machinegun".  The letter further requested reconsideration by the ATF based upon these reports and the lack of any "examination" by the ATF showing how it concluded the FRT-15 was a "machinegun".  MAXWELL letter is attached hereto as **Exhibit H**) But even though SAC acknowledged receipt of MAXWELL's letter, no further response was forthcoming and no copy of the ATF examination report was provided.

86.     In short, neither before or after the issuance of the Cease and Desist Letter were the Plaintiffs ever given any proper notice of the critical information concerning: (1) how the Plaintiffs could appear in this matter; (2) how the Plaintiffs could submit evidence to the administrative record; (3) what time frame this had to occur in; or (4) what evidence the ATF was relying on to contend that the FRT-15 was a "machinegun".  This lawsuit followed.

87.     Shortly after the filing of this lawsuit, on August 11, 2021, MAXWELL e-mailed the Defendants' counsel to discuss whether the parties wished to exchange witness and exhibit lists for the upcoming evidentiary hearing set by this Court.

[**Exhibit "I"** – August 11, 2021 E-mail Chain]. MAXWELL further advised that he was prepared to have his four experts appear at the hearing to provide their testimony – the only thing the Plaintiffs could do since the Plaintiffs were never given an opportunity to submit evidence for the administrative record and had still never been provided with the ATF's examination report or an opportunity to rebut it.  [Ex. I].

88.    But that same day (August 11th), the Defendants' attorney responded to MAXWELL and advised that the Defendants intended to file a Motion in Limine to completely exclude any testimony of the Plaintiffs' experts, as well as to exclude the reports that were attached to the Plaintiffs' original Complaint.  [See Ex. I].

89.    The Defendants' counsel stated (in no uncertain terms) that he would seek to exclude the expert reports and any testimony from the Plaintiffs experts because they were not part of the administrative record of this case.  [See Ex. I].

90.    So, after the Defendants refused to provide their examination report to the Plaintiffs, and after the Defendants gave the Plaintiffs no notice of any opportunity they had to submit any evidence or testimony for inclusion in the administrative record, or any notice about where and when such evidence could be submitted, the Defendants then proceeded to slam the door to any and all submissions claiming the administrative record was closed as of the date the Cease and Desist Letter was issued.

91.    What is more, the Defendants even expressed their clear intent to exclude the Plaintiffs' expert reports from the administrative record even though the Defendants had already received them.  [See Ex. I].

92.    This is a clear indication that the ATF had never even reviewed the reports submitted by the Plaintiffs prior to this e-mail being sent on August 11, 2021. [See Ex. I].

93.    If the reports submitted by the Plaintiffs had been reviewed, then the ATF would have included in the administrative record when they were received and reviewed.

94.    Thus, the Plaintiffs were not only deprived of meaningful notice, but even to the extent that they had submitted documents, they were still deprived of a meaningful opportunity to be heard because their submissions were not even considered.

95.    It was at that point that the Plaintiffs became aware of the Defendants' clear intent to completely deprive the Plaintiffs of due process altogether.

96.    This prompted MAXWELL to reply to the Defendants' counsel and ask exactly when the Defendants had even given the Plaintiffs an opportunity to present their evidence or rebut the ATF's examination report which had still never been provided.  [See Ex. I].  Further, as MAXWELL stated in his reply: "The ATF's failure or refusal to include my submissions in the administrative record of this case

is proof that the ATF has never even considered my submissions.  That is the very epidemy of having no meaningful opportunity to be heard.  It is also clear evidence of bad faith on the part of ATF."  [Ex. I].

97.   Suddenly realizing that they had made a major mistake, the Defendants reversed course and after 5:00 pm on August 11, 2021 contacted MAXWELL by phone to acknowledged they did in fact receive MAXWELL's letter and the reports he provided, however, the Defendants were careful to note that they found the submissions unimportant because they were not submitted until after the agency's final decision had been made on July 26, 2021 -- the very same agency decision the Plaintiffs were never given notice of or an opportunity to respond to before it was made. [See Doc. 18 at pg. 4, FN3].  This is proof that the Defendants intended to close the administrative record without giving the Plaintiffs any notice or opportunity to respond.

98.   The Defendants also tried to bandage their refusal to consider the Plaintiffs' reports by telling the Court that the ATF declined to change it position based on the expert opinion reports submitted – the very same reports that only a few hours earlier the Defendants' counsel had claimed were not even part of the administrative record in this case.  [Compare Doc. 18 at pg. 4, FN3 with Ex. I].

99.   Even though the ATF's examination report on the FRT-15 had supposedly existed since July 15, 2021, the Defendants failed to ever provide it until

approximately 2:00 pm on August 12, 2021 – 17 days after the Cease and Desist Letter was issued, 10 days after the lawsuit was filed and 2 hours after the Defendants' filed their Motion in Limine.  Curiously, the ATF's examination report made no mention of the zip-tie test that was performed by SMITH. Further, the ATF's report used screen shots of the FRT-15 from the RBT website, when in fact those images are from an animation video, which the ATF didn't attach, of the trigger operation which demonstrates why the FRT-15 is a perfectly legal semi-automatic trigger.

100.   August 12, 2021 was the first time the Plaintiffs had ever been allowed to review the ATF's examination report, and upon noting all of the faulty and intentionally misleading tests and evidence relied on by the ATF (as outlined above), MAXWELL contacted the Defendants' counsel the following day and advised that his experts were preparing rebuttals to the ATF examination report.  And because the Plaintiffs had never before been given the opportunity to review the ATF's examination report and respond to it, MAXWELL requested that the Plaintiffs rebuttal reports be included in the administrative record of this case.  [**Exhibit "I"** – August 13, 2021 E-mail Chain].

101.   Even though the ATF had just added its own examination report (as well as the other evidence it was relying on) to the administrative record that same day, the Defendants counsel refused any further evidence submissions from the

Plaintiffs claiming that the administrative record was already closed. [See Ex. I]. Thus, once again, the Defendants failed to give the Plaintiffs any meaningful notice or opportunity to respond to the ATF's examination report even though it had never been seen until that time.

102.   The decision to close the administrative record and refuse to allow any rebuttal was made by GRIFFITH.

103.   On Monday, August 16, 2021, the Defendants submitted their certified "administrative record" to the Court which was certified by GRIFFITH.

104.   GRIFFITH certified that submission as the official administrative record, but at the time he made that assertion, GRIFFITH knew that: (1) the Plaintiffs were never given notice or opportunity to respond to the ATF's investigation prior to final agency decision being made; (2) the tests conducted by SMITH were intentionally faulty and misleading; (3) the ATF failed to consider the expert reports that submitted by the Plaintiffs demonstrating why the FRT-15 is not a "machinegun"; and (4) the ATF's examination report was never disclosed to the Plaintiffs until after GRIFFITH had made the decision with the Defendants' attorney to close the administrative record and this was done intentionally to prevent the Plaintiffs from having any meaningful opportunity to respond; (5) Defendants' have refused to agree to review/consider or allow this Court to examine any of Plaintiffs' expert rebuttals to the ATF examination (Attached hereto as **Composite Exhibit K**;

(6) Defendants' have refused to agree to review/consider or allow this Court to examine any rebuttal videos, some high speed closeups, of the FRT-15 functioning (Attached hereto as **Composite Exhibit J**).

105.   The Plaintiffs have advised the Defendants that they do not intend to abide by the Cease and Desist Letter due to its false and arbitrary conclusions that the FRT-15 is a "machinegun" because such a conclusion is in direct contradiction to 26 U.S.C. § 5845(b).   In response, the Plaintiffs have now learned that the Defendants have opened a grand jury investigation in the Western District of Texas.

106.   If the Defendants' actions are allowed to stand, the Plaintiffs will be forced to disclose their confidential customer lists to the ATF who will use such lists to seize the property of and seek criminal actions against RBT's customers who will lose the monetary value of their possessions (through forced surrender, confiscation, or destruction) and their ability to use them, and all future customers of RBT will be deprived of the ability to purchase and use the FRT-15.

107.   Further, the assets of the Plaintiffs will be seized causing RBT's business to collapse and cutting off its ability to litigate this matter on the merits, as has suggested by the Defendants' is exactly what they are asking this Court to do, rule without reaching the merits. Not to mention such actions will cut off MAXWELL's income and his ability to provide for himself and his family.

108.   In addition, the Plaintiffs will be forced to close their business and disclose their confidential customer lists or risk felony prosecution, a process which has already begun in the Western District of Texas Federal Court.

109.   The Defendants' actions further place MAXWELL, who is a practicing attorney, at risk of suspension of his legal license due to this malicious criminal prosecution wrongfully brought by the Defendants.

110.   Finally, because RBT and MAXWELL's legal practice share a common address, any seizure of property by the Defendants, such as files or computers, creates an inherent and unacceptable risk of the wrongful disclosure of privileged and protected attorney/client communications, as well as protected attorney work-product and other protected intellectual property such as copyrighted documents.

## **COUNT I -- VIOLATION OF APA**

This Count is against all Defendants except GRIFFITH and SMITH.

111.   Plaintiffs reallege paragraphs 1 through 110 as though fully set forth herein.

112.   Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

113.   Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

114.   Pursuant to 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

115.   Further, "[t]he reviewing court shall: (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id.* Here the ATF's Chief Counsel's Office has repeatedly determined that a single function of a trigger means a single movement of a trigger. **See Exhibit K-3** (Rebuttal opinion of Daniel O'Kelly)

116.   The Plaintiffs have suffered legal wrongs and have been adversely affected by the actions taken by the Defendants in this case.

117.   The issuance of the Cease and Desist Letter constitutes final agency action.

118.   The Defendants intentionally and unreasonably delayed the production of the ATF's report and the rest of the evidence the ATF relied upon to deprive the Plaintiffs of a meaningful opportunity to be heard.

119.   In addition, the Defendants attempted classification of the FRT-15 as a "machinegun" is in direct conflict as defined by federal law and is therefore arbitrary, capricious, an abuse of discretion or otherwise contrary to law because:

a.   The ATF determined the outcome it wanted before any tests were ever conducted and then used faulty and intentionally misleading tests to ensure the outcome it wanted;

b.   The tests conducted by the ATF are faulty and intentionally misleading because:  (i) the ATF added parts to the alleged FRT-15 (namely a spring in the form of a zip-tie) in order to make the FRT-15 appear to be a "machinegun" when it is not; and (ii) by manipulating the zip-tie to cause the alleged FRT-15 to appear as though it fires more than one round per single function of the trigger;

c.    The ATF relied upon patents unrelated to the FRT-15, and upon triggers that do not operate in the same manner as the FRT-15, and upon arbitrary, unverified and uninvestigated internet chatter and videos, in order to conclude that the FRT-15 is a "machinegun";

d.   The ATF intentionally ignored examining the FRT-15's patent and intentionally avoided comparing the FRT-15 to the most similar trigger on the market today (the 3MR) because the ATF has already approved the 3MR trigger and the ATF knew that it would not be able to present

a legally valid distinction between the FRT-15 and the 3MR that would justify classifying one as a "machinegun" and the other as not;

e.  The ATF intentionally failed to notify the Plaintiffs of these matters prior to the final agency action of issuing the Cease and Desist Letter and have intentionally acted since that time to avoid giving the Plaintiffs any meaningful opportunity to respond to the ATF's examination report, and the purpose of this is to prevent the Plaintiffs from showing that the Defendants' actions are arbitrary and not supported by the facts or the law in this case;

f.  The ATF intentionally ignored the Plaintiffs' expert reports;

g.  By allowing the similar 3MR trigger to remain on the market while banning the FRT-15, the ATF is arbitrarily discriminating against the Plaintiffs without legally valid cause; and

h.  By attempting to change the definition of the term "single function of the trigger" under section 5845(b) when the ATF has no authority to make binding interpretations of a criminal statute under the United States Constitution or under any act of Congress.

120.  Thus, the Defendants' conclusion that the FRT-15 trigger constitutes a "machinegun" is arbitrary, without supporting evidence in the administrative record,

an abuse of the agency's discretion, is without authority and contrary to the plain language of the statute.

121.   The Plaintiffs will be irreparably harmed by Defendants' actions in the manner described in paragraphs 106-11, above.

WHEREFORE, Plaintiffs request that the Court grant all appropriate relief, including:

a.   The issuance of a preliminary injunction halting Defendants' from attempting enforcement of the Cease and Desist Letter until such time as a final hearing on the merits is held;

b.   A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-02) or other applicable law, finding that the Defendants' attempted classification of the FRT-15 as a "machinegun" is unlawful and unenforceable and that the FRT-15 does not constitute a "machinegun" under current federal law and that the Defendants lack the authority to make a binding interpretation of the terms of a criminal statute;

c.   An order permanently enjoining Defendants from enforcing their Cease and Desist Letter as it pertains to the FRT-15;

d.   An award of attorneys' fees and costs to Plaintiffs pursuant to Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority;

e.    Alternatively, a ruling that the Defendants' actions are not supported by the administrative record in this case, or that the Defendants have acted in bad faith, and that remand to the agency is necessary to allow the Plaintiffs a meaningful opportunity to submit rebuttal evidence into the administrative record; and

f.    Any other relief that this Court in its discretion deems just and proper.

## COUNT II – VIOLATION OF THE APA

122.   Plaintiffs reallege paragraphs 1 through 110 as though fully set forth herein.

123.   Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

124.   Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

125.   Pursuant to 5 U.S.C. § 706:  "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

126.   Further, "[t]he reviewing court shall:  (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside

agency action, findings, and conclusions found to be:  (B) contrary to constitutional right, power, privilege, or immunity . . . ." *Id.*

127.   The Plaintiffs have suffered legal wrongs and have been adversely affected by the actions taken by the Defendants in this case.

128.   The issuance of the Cease and Desist Letter constitutes final agency action.

129.   Prior to being deprived of their liberty to engage in business, the Plaintiffs were entitled to due process under the Fifth Amendment of the United States Constitution, which requires, at a bare minimum, meaningful notice and a meaningful opportunity to be heard either before or immediately after deprivation.

130.   The Plaintiffs further have the constitutional right to equal protection of the laws under the Due Process clause of the Fifth Amendment to the United States Constitution.

131.   The Defendants intentionally and unreasonably delayed the production of the ATF's examination report and the rest of the evidence the ATF relied upon to deprive the Plaintiffs of a meaningful opportunity to be heard.

132.   In addition, the Defendants' actions in this case are contrary to the constitutional rights of the Plaintiffs because:

a. The ATF determined the outcome it wanted before any tests were ever conducted and then used faulty and intentionally misleading tests to ensure the outcome it wanted thus depriving the Plaintiffs of a fair hearing;

b. The tests conducted by the ATF are faulty and intentionally misleading because: (i) the ATF added parts to the alleged FRT-15 (namely a spring in the form of a zip-tie) in order to make the FRT-15 appear to be a "machinegun" when it is not; and (ii) by manipulating the zip-tie to cause the alleged FRT-15 to appear as though it fires more than one round per single function of the trigger thus depriving the Plaintiffs of a fair hearing;

c. The ATF relied upon patents unrelated to the FRT-15, triggers that do not operate in the same manner as the FRT-15, and upon arbitrary, unverified and uninvestigated internet chatter and videos, in order to conclude that the FRT-15 is a "machinegun" thus depriving the Plaintiffs of a fair hearing;

d. The ATF intentionally ignored examining the FRT-15's patent and intentionally avoided comparing the FRT-15 to the most similar trigger on the market today (the 3MR) because the ATF has already approved the 3MR trigger and the ATF knows that it would not be able to present a legally valid distinction between the FRT-15 and the 3MR that would justify classifying one as a "machinegun" and the other as not thus

depriving the Plaintiffs of a fair hearing and of equal protection of the laws due to this arbitrary discrimination;

e.  The ATF failed to give the Plaintiffs any notice or opportunity to be heard prior to its final agency action of issuing the Cease and Desist Letter;

f.  The Defendants tried to close the administrative record as of the time the Cease and Desist Letter was issued thus preventing the Plaintiffs from having any opportunity to be heard;

g.  The Defendants failed to give the Plaintiffs any meaningful notice of a post-decision opportunity for the Plaintiffs to be heard;

h.  The Defendants failed to give the Plaintiffs any notice of when or where they could submit any documents or testimony for inclusion in the administrative record of this case;

i.  The Defendants failed or refused to provide the Plaintiffs with a copy of the ATF's report in any meaningful time frame to allow the Plaintiffs an opportunity to respond;

j.  The Defendants failed or refused to consider the expert reports submitted by the Plaintiffs thus depriving the Plaintiffs of a meaningful opportunity to be heard;

k.  By allowing the similar 3MR trigger to remain on the market while banning the FRT-15, the ATF is arbitrarily discriminating against the

Plaintiffs without legally valid cause which in is violation of the Plaintiffs' equal protection rights; and

l. By attempting to change the definition of the term "single function of the trigger" under section 5845(b) when the ATF has no authority to make binding interpretations of a criminal statute under the United States Constitution or under any act of Congress, the Defendants are depriving the Plaintiffs of the due process required to change the law, i.e., an act of Congress.

133.   Thus, the Defendants' actions in this case are contrary to the Plaintiffs' constitutional rights.

134.   The Plaintiffs will be irreparably harmed by Defendants' actions in the manner described in paragraphs 106-11, above.

WHEREFORE, Plaintiffs request that the Court grant all appropriate relief, including:

a.   The issuance of a preliminary injunction halting Defendants' from attempting enforcement of the Cease and Desist Letter until such time as a final hearing on the merits is held;

b.   A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-02) or other applicable law, finding that the Defendants' attempted classification of the FRT-15 as a "machinegun" is unlawful and

unenforceable and that the FRT-15 does not constitute a "machinegun" under current federal law and that the Defendants lack the authority to make a binding interpretation of the terms of a criminal statute;

c.      An order permanently enjoining Defendants from enforcing their Cease and Desist Letter as it pertains to the FRT-15;

d.      An award of attorneys' fees and costs to Plaintiffs pursuant to Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority;

e.      Alternatively, a ruling that the Defendants' actions are not supported by the administrative record in this case, or that the Defendants have acted in bad faith, and that remand to the agency is necessary to allow the Plaintiffs a meaningful opportunity to submit rebuttal evidence into the administrative record; and

f.      Any other relief that this Court in its discretion deems just and proper.

## COUNT III -- VIOLATION OF APA

This Count is against all Defendants except GRIFFITH and SMITH.

135.   Plaintiffs reallege paragraphs 1 through 110 as though fully set forth herein.

136.   Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

137.   Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

138.   Pursuant to 5 U.S.C. § 706:  "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

139.   Further, "[t]he reviewing court shall:  (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be:  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ."  *Id*.

140.   The Plaintiffs have suffered legal wrongs and have been adversely affected by the actions taken by the Defendants in this case.

141.   The issuance of the Cease and Desist Letter constitutes final agency action.

142.   The Defendants intentionally and unreasonably delayed the production of the ATF's report and the rest of the evidence the ATF relied upon to deprive the Plaintiffs of a meaningful opportunity to be heard.

143.   In addition, the Defendants conclusion that the FRT-15 is a "machinegun" as defined by federal law is in excess of the ATF's statutory jurisdiction, authority, or limitations, or short of statutory right because:

a.   By attempting to change the definition of a machinegun, which hinges on the term "single function of the trigger" under section 5845(b), when the ATF has no authority to make binding interpretations of a criminal statute under the United States Constitution or under any act of Congress; and

b.   By allowing the similar 3MR trigger to remain on the market while banning the FRT-15, the ATF is arbitrarily discriminating against the Plaintiffs without legally valid cause which exceeds its statutory powers.

144.   Thus, the Defendants' conclusion that the FRT-15 trigger constitutes a "machinegun" is without authority and contrary to the plain language of the statute.

145.   The Plaintiffs will be irreparably harmed by Defendants' actions in the manner described in paragraphs 106-11, above.

WHEREFORE, Plaintiffs request that the Court grant all appropriate relief, including:

a.    The issuance of a preliminary injunction halting Defendants' enforcement of the Cease and Desist Letter until such time as a final hearing on the merits is held;

b.    A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-02) or other applicable law, finding that the Defendants' attempted classification of the FRT-15 as a "machinegun" is unlawful and unenforceable and that the FRT-15 does not constitute a "machinegun" under current federal law and that the Defendants lack the authority to make a binding interpretation of the terms of a criminal statute;

c.    An order permanently enjoining Defendants from enforcing their Cease and Desist Letter as it pertains to the FRT-15;

d.    An award of attorneys' fees and costs to Plaintiffs pursuant to Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority;

e.    Alternatively, a ruling that the Defendants' actions are not supported by the administrative record in this case, or that the Defendants have acted in bad faith, and that remand to the agency is necessary to all the Plaintiffs a meaningful opportunity to submit rebuttal evidence into the administrative record; and

f.    Any other relief that this Court in its discretion deems just and proper.

## COUNT IV – BIVENS ACTION (SMITH AND GRIFFITH)

The Plaintiffs sue SMITH and GRIFFITH and allege:

146.   Plaintiffs reallege paragraphs 1 through 110 as though fully set forth herein.

147.   The Plaintiffs have a protected liberty interest under the United States Constitution to engage in their lawful business.

148.   That this constitutional right has been violated by SMITH and GRIFFITH who are both subject to liability directly under the Constitution.

149.   Relief in the form of money damages is an appropriate remedy in this case.

150.   There are no other effective means to vindicate the Plaintiff's rights and the damages incurred to their business.

151.   There are no "special factors counselling hesitation" in formulating a remedy for the plaintiff.

152.   While acting under the colors and authority of the United States of America, SMITH and GRIFFITH did violate plaintiff's constitutional rights.

153.   At all times material hereto, SMITH was an agent of the ATF whose job it was to conduct the testing of firearms or components of firearms to determine whether such items fit the definition of a "machinegun" under federal law.

154.   At all times material hereto, GRIFFITH was an agent of the ATF who was responsible for overseeing the investigation of this case and responsible for compiling the administrative record.

155.   Beginning in January 2021, prior to ever examining the FRT-15, the ATF viewed online videos of firearms allegedly using the FRT-15 and sent several written e-mails between agents, including SMITH, stating that the FRT-15 was expected to be a "machinegun" but that a sample had to be obtained for testing before a formal determination could be made.

156.   With that predetermined outcome in mind, the ATF obtained an alleged sample of the FRT-15 in June 2021 and provided it to SMITH for testing.

157.   The tests conducted by SMITH were designed to achieve the predetermined outcome of the ATF and were faulty and intentionally misleading because:  (i) SMITH added parts to the alleged FRT-15 (namely a spring in the form of a zip-tie) in order to make the FRT-15 appear to be a "machinegun" when it is not; and (ii) SMITH manipulated the zip-tie to cause the alleged FRT-15 to appear as though it fires more than one round per function of the trigger.

158.   SMITH also intentionally based his analysis of the FRT-15 functions upon patents that are unrelated to the FRT-15, and upon triggers that do not operate in the same manner as the FRT-15, to meet the predetermined outcome of the ATF.

159.   SMITH intentionally ignored examining the FRT-15's actual patent and intentionally avoided comparing the FRT-15 to the most similar trigger on the market today (the 3MR) because SMITH knew that the ATF had already approved the 3MR trigger and that he would not be able to present a legally valid distinction between the FRT-15 and the 3MR that would justify classifying one as a "machinegun" and the other as not.

160.   In order to prevent these problems with SMITH's testing from being brought to light, SMITH and GRIFFITH, acting in concert with each other and with other agents of the ATF, intentionally failed to contact the Plaintiffs to give them any reasonable opportunity to respond to these tests or reports so that the ATF could take the final agency action of issuing the Cease and Desist Letter and close the administrative record without any response from the Plaintiffs. Later, they also knowingly and intentionally ignored the expert reports submitted by the Plaintiffs and attempted to exclude these same expert written reports from the administrative record because they prove the FRT-15 is not a machinegun.

161.   When SAC was ordered to issue the Cease and Desist Letter to the Plaintiffs, the examination report and the testing, which was already completed, was withheld so that SAC would not provide a copy to the Plaintiffs. The purpose of this was to prevent the Plaintiffs from having any meaningful opportunity to be heard in response to the ATF's actions.

162.   The Plaintiffs received no notice of what the ATF was alleging against them at all until July 27, 2021, the day after the Cease and Desist Letter was issued and the administrative record was supposedly closed, and yet was still never provided with the ATF's examination report and evidence.

163.   GRIFFITH then compiled and certified the administrative record in this case knowing of the faulty and intentionally misleading tests included in it, as well as the faulty analysis and intentional omissions of any meaningful evaluation of the FRT-15 patent and any comparison to the 3MR trigger, the lack of provision of the ATF's examination report to the Plaintiffs, and further knowing that the Plaintiffs were never provided any meaningful notice or an opportunity to respond to the ATF's examination report and evidence.

164.   SMITH's actions violated the Plaintiffs' clearly established rights to a fair and impartial hearing and to notice and opportunity to be heard under the due process clause of the Fifth Amendment because the tests and the analysis conducted by SMITH were designed to achieve a predetermined outcome and they intentionally ignored relevant and material evidence, and sought to exclude relevant and material evidence, which SMITH knew or should have known would alter the outcome.

165.   GRIFFITH's actions violated the Plaintiffs' clearly established rights to a fair and impartial hearing and to notice and an opportunity to be heard under the due process clause of the Fifth Amendment because GRIFFITH knowingly included

the faulty and intentionally misleading tests conducted by SMITH in the administrative record, and because he concealed the ATF's examination report and other evidence from the Plaintiffs and closed the administrative record knowing that the Plaintiffs had never been given notice and a meaningful opportunity to respond to the ATF's examination report or its other evidence.

166.   SMITH and GRIFFITH also failed to consider the expert reports submitted by the Plaintiffs and attempted to exclude them from the administrative record in order to foreclose any opportunity of the Plaintiffs to respond.

167.   These actions were taken by SMITH and GRIFFITH with a deliberate or reckless disregard of Plaintiffs' constitutional rights.

168.   Because these were knowingly and intentional violations of the Plaintiffs' constitutional rights, SMITH and GRIFFITH were not acting in good faith and thus are not entitled to qualified immunity.

169.   As a result of the actions of SMITH and GRIFFITH, the Plaintiffs have been deprived of their liberty interest in conducting their lawful business.

170.   The Plaintiffs have been damaged by their loss of business and will continue to lose business in the future as a result of SMITH and GRIFFITH actions.

171.   The Plaintiffs are further entitled to punitive damages based on the reckless disregard of the Plaintiffs' constitutional rights by SMITH and GRIFFITH.

WHEREFORE, the Plaintiffs demand judgment against SMITH and GRIFFITH for their damages, punitive damages, court costs and such other relief as the Court deems just and proper.

## COUNT V – WRIT OF MANDAMUS

The Plaintiffs sue all Defendants except SMITH and GRIFFITH and allege:

172.   Plaintiffs reallege paragraphs 1 through 110 as though fully set forth herein.

173.   Pursuant to 28 U.S.C. § 1361, the district court has original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs.

174.   The Plaintiffs have a clear legal right to due process under the Fifth Amendment of the United States Constitution, which includes meaningful notice and a meaningful opportunity to be heard.

175.   The Defendants have a clear legal duty to provide such notice and an opportunity to be heard because U.S. agency action which deprives a person of liberty or property requires the fundamental protections of due process under the Fifth Amendment.  *Morgan v. United States*, 304 U.S. 1, 14-15 (1938) ("in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play . . . [and] these demand 'a fair and open hearing,' -- essential alike to the legal validity of the

administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process").

176.   Such procedural due process requires both notice and a *meaningful* opportunity to be heard.   *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (emphasis added).

177.   While pre-deprivation due process is not always required, there must at least be a prompt post-deprivation hearing with proper notice.   *See Mackey v. Montrym*, 443 U.S. 1, 13 (1979).

178.   So far as the notice requirement is concerned, it is "[a]n elementary and fundamental requirement of due process in *any* proceeding which is to be accorded finality [to receive] notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action *and afford them an opportunity to present their objections*."   *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (emphasis added) (internal citations omitted).

179.   The notice <u>must</u> convey the required information, and it <u>must</u> afford a reasonable time for those interested to make their appearance.   *Id*.

180.   In this case, the Defendants failed to provide any notice or opportunity to be heard to the Plaintiffs prior to taking the final agency action of the issuance of the Cease and Desist Letter in this case, and thus there was no pre-deprivation due process.

181.   Subsequent to the issuance of Cease and Desist Letter, the Defendants called the Plaintiffs in for meeting but failed to advise the Plaintiffs what the meeting was for.  Thus, the Plaintiffs were not given a fair and open hearing.

182.   Neither at that meeting nor after that meeting did the Defendants give the Plaintiffs any notice of when they could appear in this matter, when and where they could submit evidence or testimony to be included in the administrative record, or what the time frame would be for such submissions, and thus the post-deprivation due process was defective on that basis.

183.   Further, the Defendants failed to provide the Plaintiffs with the ATF's report in any timely manner either before, during or after this meeting took place despite repeated demands by the Plaintiffs and despite the fact that the report was completed prior to the time the Cease and Desist Letter was issued.  Thus, the post-deprivation due process was defective in this basis as well.

184.   As a result, the Plaintiffs were never given proper notice or an opportunity to present their objections to the ATF's report because the Defendants intentionally withheld that information from the Plaintiffs to deprive the Plaintiffs of any meaningful opportunity to respond, and thus the Plaintiffs have not been afforded a fair and open hearing.

185.   The Plaintiffs seek a writ of mandamus directing the Defendants to perform the ministerial function of giving the Plaintiffs proper notice of when and

where the Plaintiffs can appear in this matter, submit their evidence and testimony for inclusion in the administrative record of this case, and a reasonable time frame in which to do so.

186.   The Plaintiffs have no other available remedy to compel the Defendants to comply with due process rights of the Plaintiff.

WHEREFORE, the Plaintiffs seek a writ of mandamus directing the Defendants to perform the ministerial function of giving the Plaintiffs proper notice of when and where the Plaintiffs can appear in this matter, submit their evidence and testimony for inclusion in the administrative record of this case, and a reasonable time frame in which to do so.

/s/Kevin C. Maxwell
Kevin C. Maxwell, Esq.
Florida Bar #0604976
255 Primera Blvd, suite 160
Lake Mary, FL 32746
Tel: 407-480-2179
kevincmaxwell@gmail.com
Attorney for Plaintiffs
